Filed 2/24/16  Estate of Kwong CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Estate of STANLEY CHONG KWONG, Deceased. | |
| LARRY KWONG et al., Plaintiffs and Respondents, v. JENNIFER SHUK-HAN KWOK as Executrix et al., Defendants and Appellants. | A140437 & A141290 (San Francisco City & County Super. Ct. No. CGC-10-499028) |

**I.**

**INTRODUCTION**

This appeal arises from an action brought by Lau Kwong (Lau) and her son Larry Kwong (Larry) against the estate of her son Stanley Kwong (Stan).  Lau sought an accounting of Stan's management of her property, and to recover title to three properties.  Larry sought an accounting on behalf of his brother Harry's estate, which Stan also managed.[1]

Stan managed all of Lau's finances over a period of nearly 30 years, and Lau's assets were used for the down payment on two properties and for a share of the down payment on a third property.  At the time of his death, Stan had assets worth in excess of

---

[1] To avoid confusion, we refer to members of the Kwong family by their first names.  No disrespect is intended.

1

$14 million. He left his entire estate to his wife, Jennifer Shuk-Han Kwok (Kwok), and nothing to his mother, Lau.

After a nine-day bench trial, the trial court ultimately rejected Lau and Larry's resulting trust theory, but instead found Lau had established a loan relationship with Stan. As a result, the court held Lau and Larry were entitled to interest on the loans made to Stan, proceeds from the property rents, and proceeds from the various refinancings, all with compound interest. The court awarded Lau more than $4.5 million. The court awarded Larry more than $196,000.

On appeal, Kwok claims the trial court erred in: (1) not making the proper deduction from amounts owed; (2) applying compound interest to the base amount awarded; (3) holding Kwok and Stan's company, California Financial Mortgage Corporation (California Financial) individually liable; and (4) failing to allocate the debt among the defendants.[2] We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Evidence at Trial*

Lau emigrated from China to San Francisco in 1948 to join her husband Chong Kwong (deceased) (Chong). They had four children: Larry, Jeanne, Harry (deceased), and Stan (deceased). Lau does not read or write English and speaks only the Chinese dialect of Longdu.

Lau and Chong both worked seven days a week as night janitors, and Lau also worked in sewing factories to support their family. They lived frugally and saved small amounts of money allowing them ultimately to purchase two apartment buildings in San Francisco: in 1976 they purchased 343 Walnut Street (Walnut building), and later in 1981 they purchased 1248 Union Street (Union building). Larry and Jeanne were originally on

---

[2] Jeanne Kwong as trustee of the Stan Kwong Trust, joins in Kwok's arguments challenging the amount of the judgment and the award of compound interest. She also joins in respondents' arguments that Kwok is personally liable along with California Financial.

2

the title with Lau for the Walnut building, and Larry shared title to the Union building. Given Lau and Chong's low salaries, Larry and Jeanne, who were professionally employed, were listed on the titles to make it easier to qualify for loans. Larry testified that his parents' "life savings" were used as a down payment on the Walnut building and they owned the property, even though he was listed on the deed. Larry later conveyed his interest in both properties to Stan.

Lau, Larry, and Jeanne all believed that Lau solely owned the Union building. The source of the down payment was Lau's funds along with small amounts from Jeanne and Larry. But, there also was conflicting evidence that Jeanne contributed $10,000, Larry contributed $15,000, and Stan contributed $47,500 to purchase the Union building.

Stan formed California Financial in the early 1980's, and he was its sole shareholder and director. Through California Financial, he invested in real estate and ran a mortgage brokerage business. Kwok worked at California Financial and took over the business after Stan's death.

According to Lau, Stan also purchased a building on Van Ness Avenue (Van Ness building) using her funds as a down payment. The down payment for the Van Ness building consisted of $186,534 from Lau, $40,000 from Harry (or Harry and Stan jointly), and the remainder from Stan. Stan and California Financial held the title to the Van Ness building, but Lau claimed a 42 percent interest and Harry claimed a 9 percent interest.

The title to the Walnut building and Union building transferred many times among the family members. At the time of Stan's death, the title to the Walnut building was held one-third by Lau, one-third by Stan, and one-third by Jeanne (although Jeanne later quitclaimed her one-third share to Lau).[3] Stan held a 1/20th interest in the Union

---

[3] At the time of Stan's death, Jeanne possessed a one-third interest in the Walnut building. In January 2010, she transferred her interest to Lau via quitclaim deed. The deed, however, is unrecorded, but the trial court concluded this did not affect the validity of the deed. The trial court found Lau owned a two-thirds interest in the Walnut building.

3

building and Lau held the rest. Record title to the Van Ness building was in the name of Stan and California Financial.

During the 30 years leading up to the underlying litigation, money was distributed to Larry, Jeanne, Harry, and Stan. Lau gave Larry $100,000 for renovations on his home. After Larry transferred his interest in the Walnut building and Union building to Stan, Lau gave Larry roughly $170,000 to be used as a down payment on another property. Jeanne was also given approximately $62,000 to assist with the down payment on a property. She paid back some of the amount and interest, but the remaining $50,000 plus interest was a gift from Lau. Lau also gave Jeanne roughly $100,000 for improvements on Jeanne's home.

Stan accumulated a large real estate portfolio worth as much as $20 million. Upon his death, Stan bequeathed all of his holdings to his wife, Kwok, pursuant to his estate plan.

### B. *Procedural History and Trial Results*

Initially, respondents filed a probate action after Stan's death. Both Lau and Harry's estate filed claims against Stan's estate, and those claims were rejected by the probate court.

Thereafter, they filed the underlying civil action. The operative pleading was the second amended complaint (SAC), which alleged causes of action to establish a resulting trust, for an accounting, constructive trust, conversion, financial elder abuse, and to quiet title. The plaintiffs in the underlying action were Lau individually and as trustee of the "Lau Kwong Trust ,"and Larry as both trustee of the Lau Kwong Trust and administrator of the "Estate of Harry C. Kwong." The named defendants were Kwok as the executor of Stan's estate, the trustee of the "Stanley Kwong and Jennifer Kwok Revocable Trust," the trustee of the "Stanley Kwong Marital Trust" and other trusts, Kwok individually, Jeanne as a trustee of the Stan Kwong Trust, and California Financial.

California Financial was included as a defendant in causes of action in the SAC specifically for an accounting and resulting constructive trusts for all three properties. The SAC alleged Stan conveyed his interest in the Van Ness building to California

4

Financial and it collected rents and profits from the property for the benefit of Lau and Harry.

During the nine-day bench trial, Betty Kwong, Larry's wife, who is a certified public accountant, testified as an expert witness. She reviewed Stan's records to try to determine Stan and Lau's investments. She determined the down payment for the Walnut building came from Lau and Chong's savings. She further determined that Lau made the down payment on the Union building. From her analysis of the tax returns, Stan would not have had the funds to make the down payments himself. Finally, she determined Lau's funds were used for approximately 42 percent of the down payment on the Van Ness building in the amount of $186,535. Lau was not reimbursed for these funds. Harry contributed about $40,000 as well to the Van Ness building down payment. Based on the cash flow analysis, she determined that Lau was entitled to $2,448,204 (not including interest). Lau was owed an additional $272,525 from the refinancing of the Walnut building.

Betty Kwong explained that when she analyzed the numbers under a different approach, the disbursement method, she reached a total owed to Lau that was $400,000 more—$2,966,450. She documented that Stan used money from Lau's accounts to pay expenses on his own properties. She also accounted for money Stan deposited into Lau's accounts. Based on all the information, Betty made a summary of Lau's claims, and the total was $4,570,742.

Respondent's second expert, Everett Harry, testified that both he and Betty Kwong tried to determine "the universe of cash that needs to be accounted for on behalf of Lau." His report calculated that Stan's estate owed Lau roughly $3.2 million (not including interest) using a third accounting method, the portfolio approach. He explained that both he and Betty determined money that should be credited to Lau for cash flows from the Walnut and Union buildings, and her share of the cash flow from the Van Ness building was reduced by any distributions to her children, other than Stan.

Kwok's accounting expert, Sander Stadtler, performed a cash flow analysis similar to that performed by Betty Kwong. His analysis deducted funds disbursed to the various

5

family members.  He testified about the difficulty in performing a complete accounting given the more than 30-year time period and the lack of complete records.  He said he agreed with the "total bucket" determined by Betty Kwong.

After the close of evidence, the court allowed the parties to submit written final arguments and held a hearing in July 2012.  The court inquired how the parties anticipated the court would make the  necessary factual findings for the accounting given the gaps in the financial records.  Respondents argued that under the cash flow approach, the parties were nearly in agreement about the amount of "funds in the bucket," but they disagreed about how to allocate these funds.  Therefore, respondents advocated for the court to adopt the portfolio approach used by their expert, Everett Harry.  Under this approach, Stan would be given a "fair return" for his work in growing the family's wealth, which consisted of two percent of the purchase price of the properties, plus a 20 percent equity carry.  Stan used Lau's money to build his own real estate portfolio that included 19 properties over 30 years.

As an alternate approach, respondents argued that if Stan had not refinanced the Walnut and Union buildings, they would have been paid off by now.  Instead, they are currently subject to $1.5 million in debt.  Additionally, Lau would have had the cash flow from the properties over the years.

Kwok argued if the court accepted Everett Harry's approach to "turn back the clock," then the money that Jeanne and Larry took out of the properties would also have to be returned or reduced from the amount owed.

The court advised the parties that it was going to appoint a probate referee, who was a certified public accountant, to independently review the financial information.  The referee prepared a report for the court in which he relied on Betty's summary of cash flow, exhibit 19 at trial, as the comprehensive source for the annual principal loan amounts.  The referee noted Kwok's analysis, trial exhibit 73, produced a similar total amount with a variance of less than .01 percent.  In his report he applied the United States Prime Interest Rate for each calendar year, compounding annually through September 20, 2013.

6

The referee concluded that Lau had loaned Stan a total of $1,217,986 for the Walnut building with interest of $1,701,050.49 for a total owed of $2,919,036.49. Lau had loaned Stan a total of $422,743 on the Union building with interest of $326,713.06 for a total owed of $749,456.06. Lau had loaned Stan a total of $186,534.60 on the Van Ness building with interest of $727,876.94 for a total owed of $914,411.54. The total of the loans with interest was $4,582,904.09. Larry loaned Stan $40,000 with interest of $156,084.06 for a total owed of $196,084.06.

The court issued a tentative statement of decision incorporating the referee's accounting analysis. Kwok filed a response to the court's tentative decision and argued, among other points, that respondents were not entitled to compound interest, because compound interest is not allowed in an action based on contract and simple interest should be applied.

In its final statement of decision, issued on September 30, 2013, the court found that respondents "have failed to sufficiently demonstrate that the Stan Kwong Trust holds the title to the Walnut, Union, and Van Ness properties as a trustee of a resulting trust for Plaintiffs."[4]

Instead, the court found that the various money transfers from Lau to Stan were investment loans. The court concluded: "The default financial relationship between family members where a resulting trust fails is that of gifts . . . [but] the Court rejects gifts as the default relationship." Given the family relationship, Lau would not gift virtually all of her assets to Stan alone, "leaving his siblings without a share of their parents' bounty." Lau did not gift the assets to Stan, but rather she established a loan relationship. "Lau is entitled to: Lau's transfers of funds to Stan plus compounded interest; proceeds from rents according to Lau's share of ownership in the Walnut and Union Street properties, plus compounded interest, and proceeds from refinancing of the

---

[4] The parties do not challenge the trial court's determination that there was not a resulting trust relationship established among the parties.

Walnut and Union Street properties according to Lau's share of ownership, plus compounded interest." (Fn. omitted.)

The trial court noted that Kwok contested the award of compound interest, but concluded that because respondents' recovery was based on Stan's fiduciary duty, an award of compound interest was appropriate. "Plaintiffs are entitled to compound interest. Defendants' position misunderstands the nature of the case and to what recovery Plaintiffs are entitled." Therefore, the court awarded judgment to Lau in the amount of $4,582,904.09.

On October 31, 2013, Kwok filed a motion to vacate the decision, or in the alternative for a new trial and to stay the judgment. Among other matters, the motion stated that the court failed to deduct funds that had been received by family members, including funds distributed over the 30-year period. Kwok further argued the court incorrectly applied compound interest because compound interest is not appropriate in a case involving a trustee or fiduciary. The motion did not address the application of the judgment to Kwok as an individual or to California Financial.

On December 23, 2013, the court denied Kwok's motion. The court determined that Lau was clearly owed some amount of money and it exercised its equitable powers to determine there was a loan relationship. Given that decision, the referee was charged with determining the amount owed. On the issue of staying the judgment, the court stated its concern that if it did not issue the abstract of judgment, there was a danger of dissipating the assets. Therefore, the court also denied the request for a stay.

Following the hearing, respondents mailed a proposed judgment that included Kwok as a defendant both individually and in her representative capacity. It awarded $4.8 million against Stan's estate and trusts, and it also imposed the obligation on Kwok individually.

In response Kwok sent three letters to respondents' counsel and to the court objecting to the proposed judgment. In each letter, Kwok argued that because the court made no findings or conclusions about Kwok's liability individually, she should not be held personally liable. Respondents replied that Kwok was the surviving spouse and

8

upon Stan's death she became personally liable for the debts chargeable to Stan's half of the community property, citing Probate Code sections 13550 and 13551.

The court held another hearing on January 14, 2014, at which Kwok objected to her being identified individually in the proposed judgment. The court elected to sign the proposed judgment and advised counsel that Kwok could address the issue of her individual liability as part of a later allocation among the defendants. The court stated the matter should return to the probate court for that purpose.

The court entered judgment on January 23, 2014, and awarded Lau $4,582,904.09 plus daily interest of $50,600.68, and awarded Larry $196,084.06 plus daily interest of $2,165.04 from Kwok as the executor of Stan's estate, the trustee of the Stanley Kwong and Jennifer Kwok Revocable Trust, the trustee of the Stanley Kwong Marital Trust and other trusts, Kwok individually, and California Financial. It stated the judgment against Kwok as executor would be payable out of the property of the Estate of Stanley Kwong. The judgment against Kwok as the trustee would be paid out of the trusts. The court denied Kwok's motion to stay enforcement of the judgment.

## III.

## DISCUSSION

### A.    *Standard of Review*

"The trial court's discretion to grant or deny equitable relief is broad, and we must indulge all inferences in favor of its decision." (*Abers v. Rohrs* (2013) 217 Cal.App.4th 1199, 1208.) Equity aims to do right and to accomplish justice. (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 770.) "The equitable powers of a court are not curbed by rigid rules of law, and thus wide play is reserved to the court's conscience in formulating its decrees." (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1133.) The "basic principle of equity jurisprudence means that in any given context in which the court is prevailed upon to exercise its equitable powers, it should weigh the competing equities bearing on the issue at hand and then grant or deny relief based on the overall balance of these equities. . . ." (*Id.* at pp. 1133-1134, citing *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180.)

9

A trial court's factual findings in an equitable action for an accounting are reviewed for an abuse of discretion. (*Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1392.)

Each of the claims in this appeal arises from the trial court's final statement of decision. " 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 45-46 (*Altavion*), quoting *In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.) " '[F]indings of fact are liberally construed to support the judgment.'. . ." (*Altavion*, at pp. 45-46, quoting *Estate of Young* (2008) 160 Cal.App.4th 62, 75-76.)

The trial court's statement of decision is not required to address all the legal and factual issues raised by the parties, and may simply state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125 (*Muzquiz*).)

**B.     *Respondents Did Not Make Judicial Admissions Concerning the Amount of Credits to Which Kwok Was Entitled, and The Trial Court Did Not Adopt the Cash Flow Accounting Method in Its Statement of Decision***

Kwok and respondents do not dispute the court's calculation of Lau's and Larry's shares of the proceeds from the properties. However, Kwok argues the trial court adopted the cash flow approach, and therefore it erred in not deducting certain agreed-upon amounts from this total. Kwok contends respondents made judicial admissions concerning several deductions or credits sought by Kwok, and they should be bound by those concessions.

"A judicial admission is a party's unequivocal concession of the truth of a matter, and removes the matter as an issue in the case. [Citations.]" (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48.) A clear and deliberate statement by counsel in closing argument can be a binding a judicial admission. (*Fassberg Construction Co. v.*

10

*Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752.)
"[S]tatements of counsel in argument are not deemed judicial admissions unless they have the formality of an admission or a stipulation. [Citations.]" (*People v. Kiney* (2007) 151 Cal.App.4th 807, 815.)

Kwok cites to various instances during the litigation where she contends respondents conceded deductions were necessary. For example, Kwok contends in both respondents' opening statement and closing argument they expressly admitted Kwok was entitled to deductions. In opening statement, counsel stated: "Lau acknowledges that Stan distributed some of the money that he collected to other family members, and [s]he doesn't challenge those disbursements." In their written closing argument, respondents agreed that under the cash flow approach, approximately $970,000 was paid to family members from joint accounts.

Kwok also references Betty Kwong's testimony where she discussed the adjustments she made in conducting her accounting. She argues Betty Kwong disputed the amounts of some of their expert's deductions, but did not challenge the fact Stadtler made deductions.[5]

Kwok's argument fails for two reasons. First, she cannot demonstrate that respondents should be bound by these comments or statements made during the course of trial. Second, the court rejected respondents' resulting trust theory and the various approaches advanced by the parties to calculate the money owed to Lau and Larry and found a loan relationship between the parties.

Contrary to Kwok's position, respondents did not concede the cash flow approach with any attendant deductions was the accounting theory the court should use. Instead,

---

[5] Kwok also misidentifies other statements as admissions. In reference to the Kestoff and Stack notes, respondents stated they "agree with this credit in principal," but because Kwok has collected the monthly payments on the notes and not turned them over to Lau, Kwok is not entitled to a credit. Similarly, respondents argued Stan should not get credit for the funds in the joint accounts at the time of his death, taxes paid on the properties, and for money advanced from Stan's personal accounts to other family members.

11

during closing argument, respondents argued the court should adopt the portfolio approach that does not rely on the cash flow debit and credit analysis. Respondents advocated for the portfolio approach as "the fairest in light of the fact that Stan built his wealth with Lau's money," but acknowledged the court had the discretion to choose any of the approaches.

In addition, the fact that respondents and Kwok generally agreed on the amount at issue, and that Betty Kwong stated some deductions should be made, is not a binding judicial admission that all deductions claimed by Kwok should be allowed. Respondents' statement that Lau did not contest disbursements had been made is not the equivalent of a factual admission about specific credits.

Kwok's relies on *Lane v. Wilkins* (1964) 229 Cal.App.2d 315 in support of her contention that the deductions and credits she claimed at trial had been conceded by respondents. This decision is far different from the facts here. In *Lane*, the parties had entered into a contingent free agreement where the parties agreed in pretrial documents that defendants were entitled to specific credits for attorney fees already paid. A share of the attorney fees was credited in the complaint and the parties' joint pretrial statement. (*Id.* at p. 322.) The appellate court concluded that the lower court was bound by the agreed-upon statement of facts contained in the pretrial statement. (*Ibid.*)

To the contrary, in this case the parties did not agree upon most specific deductions prior to or during trial. The parties agreed on Betty Kwong's analysis as a baseline, but then the entire nine-day trial was about what credits or deductions impacted that "bucket" of assets.

12

In any event, it is apparent that Kwok's claim for credits and deductions was considered by the trial court prior to its statement of decision.[6] The court sat as the trier of fact during the nine-day bench trial and actively questioned the witnesses throughout trial. It appointed a certified public accountant as the referee to review the voluminous financial records in this case. After careful consideration, it outlined its findings in a lengthy statement of decision attaching the referee's report. The court's statement of decision noted that it relied on the referee's calculations of the loan amounts with interest. Contrary to Kwok's contentions, the court did not expressly adopt the cash flow accounting method, or any of the parties' accounting methods. The court found a loan relationship and calculated the amount owed to Lau based upon the loans and interest. The court found Lau loaned Stan: (1) $1,217,986 for the Walnut building with interest; (2) $422,743 for the Union building with interest and; (3) $186,534.60 for the Van Ness building with interest. Larry loaned Stan $40,000 with interest. The referee relied upon Betty Kwong's analysis in exhibit 19 as a source for the loan amounts, but this does not mean the report adopted her analysis of the credits and deductions. A review of the referee's calculations demonstrates the court did not adopt the approaches advanced by either party and was therefore not bound by any alleged admissions regarding deductions and credits.

The court's findings were supported by substantial evidence. " ' "It is fundamental that where a judgment is attacked on the ground that it is not supported, the power of the appellate court ends when it shall once have determined that there is

_____

[6] Kwok's argument is impaired by the fact she did not file a request for a statement of decision as to the deductions. (See Code Civ. Proc., § 632 [upon the timely request of one of the parties in a nonjury trial, a trial court is required to render a statement of decision addressing the factual and legal bases for its decision as to each of the principal controverted issues of the case].) Thus, the court did not specifically address the claimed deductions in its statement of decision, nor was it required to do so. (*Muzquiz*, *supra*, 79 Cal.App.4th at pp. 1124-1125 [trial court's statement of decision is not required to address all the legal and factual issues raised by the parties, and may simply state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered in reaching its decision].)

substantial evidence which will support the conclusions of the trial court." [Citations.]' "
(*Islas v. Islas* (1963) 213 Cal.App.2d 412, 416.)

As the court stated itself: "[C]learly, there is some amount that Lau is due . . . . [¶] And the Court exercised its equitable powers in arriving at that conclusion that a loan relationship was created. And given that, the referee was charged with saying . . . what does that add up to?" The trial court "was *not* required to address how it resolved intermediate evidentiary conflicts, or respond point by point to the various issues posed in appellant's request for a statement of decision. [Citations.]" (*Muzquiz*, *supra*, 79 Cal.App.4th at p. 1126, original italics.) The court's judgment is supported by the accounting evidence presented below, including the referee's report, as discussed in the statement of decision. (See *Abers v. Rohrs*, *supra*, 217 Cal.App.4th at p. 1208 [we indulge all inferences in favor of the trial court's grant of equitable relief].)

### C. *The Trial Court Had Discretion to Award Compound Prejudgment Interest*

Kwok next claims that the trial court erred in awarding compound interest to the base amount awarded to respondents because respondents never requested compound interest and, as a matter of law, respondents were not entitled to it.

Her arguments against such an award of interest have varied as this case proceeded. Initially, after the court issued its tentative statement of decision, Kwok argued that respondents were not entitled to compound interest because respondents' claims were based on breach of contract, and only simple interest applied. Later, in her new trial motion, Kwok again argued the court incorrectly applied compound interest, but she raised a new theory: compound interest was not appropriate in a case against a trustee or fiduciary. On appeal, she raises a third theory, not raised below, that Probate Code section 16441 applies and prohibits an award of compound interest.

In its final decision, the trial court noted that Kwok contested the award of compound interest, but found because respondents' recovery was based on Stan's fiduciary duty, an award of compound interest was appropriate. "Plaintiffs are entitled to compound interest. Defendants' position misunderstands the nature of the case and to

14

what recovery Plaintiffs are entitled.  Plaintiffs' recovery is based upon Stan's fiduciary duty to account to Plaintiffs for the funds they transferred to him—a principle touched upon throughout this decision."  The court cited to *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585 (*Michelson*).  The court further found that in cases like this, where it is difficult to ascertain the profits realized from the transfer, compound interest is proper.  (*Title Ins. & Trust Co. v. Ingersoll* (1910) 158 Cal. 474, 488.)

In *Michelson*, the defendant, Hamada, provided billing and accounting services and shared office space with another surgeon, Michelson.  (*Michelson*, *supra*, 29 Cal.App.4th at pp. 1574-1575.)  Michelson alleged that Hamada diverted his funds and brought an action for breach of contract, breach of fiduciary duty, and fraud.  (*Id.* at p. 1575.)  The court found Hamada had a fiduciary relationship with Michelson in handling his accounts and collecting proceeds.  (*Ibid.*)  After the jury awarded damages including compound interest to Michelson, Hamada argued compound interest should not have been allowed because it was solely authorized in actions against trustees, not where there is a fiduciary relationship.  (*Id.* at p. 1586.)  The court disagreed.  "Hamada stood in a fiduciary relationship with Michelson and the jury found that he breached his fiduciary duty.  [The] cases confirm that an award of compound interest *is appropriate* in this type of case."  (*Ibid.*, original italics.)  We agree, and conclude there was no error in the trial court adding compound interest on the principal amount of respondents' award against Kwok.

As noted, for the first time on appeal, Kwok argues that Probate Code section 16441 governs this case and it allows only simple interest.  Kwok asserts that *Michelson* does not apply because it did not discuss section 16441 and relied on cases utilizing outdated law that allowed for compound interest.

Section 16441 provides a trustee is liable for interest that accrues at the "legal rate on judgments in effect during the period when the interest is accrued."  (Prob. Code,

§ 16441, subd. (a)(1).)  But, section 16441 only applies to trusts.[7]  The trial court expressly found a *loan relationship* between the parties rather than a *trust relationship*. The trial court considered and rejected respondents' resulting trust theory and instead found Stan acted as a fiduciary for Lau and Larry.  " '[N]ormally, the question whether the parties in their dealings have created a trust is one of fact to be determined largely by ascertaining the intent of the parties [citations].  Where . . . the trial court's determination of fact is based on conflicting evidence, or at least evidence giving rise to conflicting inferences, the substantial evidence rule applies, and the trial court's determination will not be disturbed on appeal.'. . ." (*United Methodist Church*, *supra*, 121 Cal.App.4th at p. 764, quoting *Presbytery of Riverside v. Community Church of Palm Springs* (1979) 89 Cal.App.3d 910, 931.)

We conclude the trial court's determination that the parties had a fiduciary relationship, but did not establish a resulting trust, is supported by substantial evidence in the record, and accordingly Probate Code section 16441 does not apply.

The court, therefore, had the discretion to apply compound interest.  Civil Code section 3288 provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."  In a nonjury trial, the court has discretion to award prejudgment interest.  (*Pepitone v. Russo* (1976) 64 Cal.App.3d 685, 690.)  The court may award prejudgment interest to compensate a party for the loss of property.  (*Altavion*, *supra*, 226 Cal.App.4th at p. 69.)  As the trial court noted, in a situation like the Kwong family involving numerous transactions where it is difficult to ascertain the profits, compound interest is allowable.  (See *Title Ins. & Trust Co. v. Ingersoll* (1910) 158 Cal. 474, 488 ["A charge of compound interest, or simple interest, is authorized where the transactions

---

[7]  A trust is " 'a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.'. . ." (*California-Nevada Annual Conf. of the United Methodist Church v. St. Luke's United Methodist Church* (2004) 121 Cal.App.4th 754, 767 (*United Methodist Church*), quoting Rest.2d Trusts, § 2, p. 6.)

16

are of such a nature that it is extremely difficult or impracticable to ascertain with any degree of certainty what profit was realized[.]"].)

**D.**     ***The Judgment Properly Included Kwok Individually***

The SAC named Kwok as a defendant individually as well as in her fiduciary capacity and sought remedies against her individually and as Stan's representative.  The SAC also alleged Kwok was Stan's spouse "who, upon information and belief, has not made an election to have all of the community property and quasi community property owned by Kwok and the decedent administered under the Probate Code."  Under Probate Code section 13550, "upon the death of a married person, the surviving spouse is personally liable for the debts of the deceased spouse chargeable against the property" as provided in Probate Code section 13551.  (Prob. Code, § 13550.)

Kwok does not contend that Probate Code section 13550 is inapplicable; rather, she asserts that despite the fact she was named as a defendant individually, respondents abandoned their claims against her as an individual.  Kwok supports her abandonment theory by citing to various examples in respondents pleadings which state they seek to recover from "Stan's estate"  or from Lau's "son's estate."  For instance, Kwok contends respondents' written closing argument did not address Kwok individually.

Kwok is correct that some of respondents' pleadings did not address the defendants by individual name, but instead referred to them collectively as a general group or at times as "Stan's estate," "defendants," or as "Stan or Jennifer."  However, as to Kwok individually, in their written rebuttal argument below, respondents argued: "The only fair result in this case is to award Lau the fruits of the hard work and sacrifice that she and Chong made over the decades.  It would not be fair to let Jennifer retain those fruits.  She did absolutely nothing to create them, the funds do not belong to her, and she does not need them."  This type of argument does not evidence an intent by respondents to abandon their claims against Kwok in any capacity.

Nevertheless, Kwok argues that respondents' abandonment of her as an individual defendant is evidenced in their request for a statement of decision, which did not include in the request that the status of Kwok individually be included.  But, respondents' request

17

addressed only a handful of controverted issues as proposed additions to the court's tentative decision, and was intended to respond to the specific issues that Kwok raised in her objections. The fact that respondents did not address Kwok's status as a defendant does not demonstrate abandonment. In fact, there was no need to address it, as both the tentative and final statements of decision held that they "shall take judgment [a]gainst [d]efendants," and the named defendants include Kwok individually.

In *Kaufman & Broad Bldg. Co. v. City & Suburban Mortg. Co.* (1970) 10 Cal.App.3d 206 (*Kaufman*), the court held a party must express a clear intent to abandon a cause of action. In that case, the trial court issued a directed verdict for the defendant, based on the conclusion that the plaintiff had abandoned one cause of action. The reviewing court concluded that the plaintiff had not unequivocally indicated an intent to abandon the cause of action. Relying on the Code of Civil Procedure, the court held "section 581, subdivision [d] has traditionally been a mechanism by which a plaintiff (*and not the court*) voluntarily dismissed an action which has been expressly and intentionally abandoned." (*Kaufman*, at p. 213, original italics.) The court concluded that in order to abandon a cause of action, the plaintiff must evidence "a clear, unequivocal and express intent to abandon an action. Such intent must be demonstrated to the court by way of a motion to dismiss, stipulation of the parties or some other form of express intent on the record." (*Ibid.*)

Similarly, on this record there is no evidence that respondents clearly, unequivocally, and expressly abandoned their claims against Kwok. Kwok asserts that respondents' "continued silence" unequivocally confirmed their intent to abandon Kwok as an individual defendant while "expressly and repeatedly" announcing their decision to pursue Stan's estate. But silence does not constitute abandonment. Respondents never stated, at any point in this litigation, they were not seeking to recover against Kwok. The fact that in their pleadings and argument they referred to the defendants as a group or at times as "Stan" or "Stan's estate" is not sufficient evidence of abandonment. Further, the fact the court did not identify each defendant by name in the statement of decision, but

18

instead issued judgment against "defendants" collectively also does not support abandonment.

Kwok's reliance on *Muzzi v. Bel Air Mart* (2009) 171 Cal.App.4th 456, 458 (*Muzzi)* to support her abandonment theory is misplaced. *Muzzi* involved a lawsuit over the lease of a grocery store. The complaint mentioned the grocery store's use of both storage containers and refrigerated trailers in the parking lot, but the "focus" of the complaint was on the containers. (*Id.* at p. 463.) Throughout the litigation, plaintiff discussed the containers, but not the refrigerated trailers. (*Ibid.*) The trial court's statement of decision discussed the containers but said the trailers were not in dispute. (*Ibid.*) The appellate court concluded: "Even if [the] plaintiffs' complaint might be construed as including a reference to storage trailers, that issue was abandoned as trial progressed. The evidence supports the trial court's conclusion that the use of refrigerated trailers was not at issue." (*Id.* at p. 464.)

This case is distinguishable from *Muzzi*. In that case, the focus of the subject matter of the litigation, not the parties' status, plainly changed during the course of the trial. However, the question of whether the liability of a named party has been abandoned is a procedural decision that cannot occur without deliberation and an express, unequivocal act by the plaintiff. Respondents never stated any intent to eliminate any of the named defendants, including Kwok, and their conduct was not so clear that such intent can be fairly inferred.

Therefore, Kwok has not demonstrated respondents abandoned their claims against her individually, and the court properly imposed judgment against her.

### E.     *The Trial Court Properly Entered Judgment Against California Financial*

Kwok also urges us to reverse the judgment against California Financial. She argues respondents' claims against California Financial were limited to the Van Ness

building and they have abandoned any other claims.  In the alternative, Kwok argues the maximum award against California Financial should be limited to $24,000.[8]

California Financial never raised either the abandonment issue or the maximum award amount in the trial court, and therefore the issue is waived on appeal.  "A failure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or by the court.  [Citation.]"  (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719.)  If, as here, the ascertainment of the amount of damages turns on the credibility of witnesses, resolution of factual questions, or conflicting evidence, the issue cannot be challenged for the first time on appeal.  (*Id.* at pp. 719-720; *County of Los Angeles v. Southern California Edison Co.* (2003) 112 Cal.App.4th 1108, 1118.)

**F.**     ***The Allocation of Debt Is Not an Issue Properly Before the Court***

Kwok lastly argues that if the judgment below is affirmed against her individually, we should modify or reverse the judgment to allow the probate court to make a more equitable allocation of the award among the defendants.

At a hearing prior to the entry of judgment on January 14, 2014, the court advised the parties that it believed the matter needed to return to the probate court on the issue of allocation.  Thereafter, Kwok filed two petitions to allocate debt in separate actions in probate court.  She filed one petition in the action involving the estate of her deceased husband, Stan Kwong (San Francisco Superior Court, case no. PES-09-292733), and another in the action involving the Stan Kwong Trust (San Francisco Superior Court, case no. PES-09-293019).

Kwok has two pending petitions in probate court.  That court has not yet ruled on these allocation petitions, and therefore there are no orders from the probate court before us to review.  Nevertheless, Kwok now asks this court to ensure that the probate court "shall determine whether, how much, and when any portion of the plaintiffs' ultimate

---

[8]  Kwok's figure of $24,000 comes from Betty's accounting at trial (exhibit 18).  It lists payments from Stan to California Financial totaling $609,000 and then shows repayment of $585,000, leaving a remainder of $24,000.

20

recovery in this matter shall be enforceable against Jennifer [Kwok] individually." This request is not ripe for decision. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.) When the probate court renders a judgment, Kwok can appeal at that time if she discerns error in that court's determination.

# IV.

## DISPOSITION

The judgment is affirmed.  Both sides shall bear their own costs on appeal.

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
STREETER, J.

A140437, A141290, *Estate of Kwong*